# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| HUMANIGEN, INC. and MADISON JOINT VENTURE LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SAVANT NEGLECTED DISEASES, LLC,<br><br>Defendant. | C.A. N17C-07-068-PRW CCLD |
| SAVANT NEGLECTED DISEASES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>HUMANIGEN, INC.,<br>NOMIS BAY LTD. and MADISON JOINT VENTURE LLC,<br><br>Defendants. | C.A. No. 2019-0417-PRW |

Submitted: July 24, 2020
Decided: August 17, 2020

## OPINION AND ORDER

*Upon Savant Neglected Diseases, LLC's Motion for Summary Judgment,*
**DENIED.**

*Upon Savant Neglected Diseases, LLC's Motion to Dismiss,*
**GRANTED IN PART and DENIED IN PART.**

*Upon Humanigen, Inc., Nomis Bay Ltd., and Madison Joint Venture, LLC's
Motion to Dismiss,*
**DENIED.**

Jeffrey L. Moyer, Esquire, Travis S. Hunter, Esquire, Tyler E. Cragg, Esquire, RICHARDS LAYTON & FINGER, Wilmington Delaware, *Attorneys for Humanigen, Inc., Nomis Bay Ltd. and Madison Joint Venture LLC.*

Steven P. Wood, Esquire, Dawn Kurtz Crompton, Esquire, Travis J. Ferguson, Esquire, MCCARTER & ENGLISH, LLP, Wilmington, Delaware, *Attorneys for Savant Neglected Diseases, LLC.*

**WALLACE, J.**

This suit arises out of a contractual dispute over the parties' efforts to bring benznidazole (the "Drug") to market in the United States as a treatment for Chagas disease.[1] Savant Neglected Diseases, LLC and Humanigen, Inc.[2] entered a contractual agreement ("MDC")[3] to develop the Drug and pursue FDA approval using Savant's ostensibly proprietary data. The collapse of that relationship led Humanigen and its principal creditor, Nomis Bay, Ltd. to create Madison Joint Venture LLC as a vehicle for taking over development of and litigation surrounding the Drug in exchange for debt forgiveness.[4]

Humanigen, later joined by Madison, filed suit before the Superior Court.[5] Savant removed to the District of Delaware,[6] only for the case to eventually be

---

[1] Chagas disease is a tropical disease caused by an insect-borne parasitic infection. In addition to acute symptoms that may or may not present immediately after exposure, years or decades later infected people may develop a chronic form. Both the acute and chronic courses of Chagas disease are life-threatening. *See generally Parasites – American Trypanosomiasis*, Centers for Disease Control and Prevention, https://www.cdc.gov/parasites/chagas/gen_info/detailed.html (last accessed Aug. 13, 2020).

[2] Then known as KaloBios.

[3] Def. Mot. to Dismiss Op. Br., *Humanigen, Inc. v. Savant Neglected Diseases, LLC*, N17C-07-068, ex. A (D.I. 156). Hereinafter, all references to the docket in Superior Court case *Humanigen, Inc. v. Savant Neglected Diseases, LLC*, N17C-07-068 are styled "D.I." All references to the docket in Court of Chancery case *Savant Neglected Diseases, LLC v. Humanigen, Inc.*, 2019-0417 are styled "Ch. D.I."

[4] Second Amended Complaint at ¶ 137. (D.I. 138).

[5] Complaint (D.I. 1); Amended Complaint (D.I. 93); Second Amended Complaint (D.I. 138).

[6] Notice of Filing of Notice of Removal (D.I. 5).

returned.[7] Savant filed its own action in the Court of Chancery against Humanigen and Madison,[8] later adding Nomis as a party defendant.[9] All claims in both suits relate to breach of or fraud in the inducement of the MDC. And the consolidated action is now before the undersigned to hear and decide.[10]

## I. THE MOTIONS

Three dispositive Motions are pending before the Court, one from Humanigen, Madison, and Nomis; and the other two from Savant. Humanigen, Madison, and Nomis move for dismissal of the Chancery suit, arguing that Savant lacks capacity to sue, that this Court lacks personal jurisdiction over Nomis, and that Savant fails to state a claim.[11] Savant for its part moves to dismiss Madison's claims

---

[7] Order Remanding Case (D.I. 9).

[8] Complaint (Del. Ch. D.I. 1).

[9] Amended Complaint (Del. Ch. D.I. 11).

[10] Del. Const. art IV, § 13(2) empowers the Chief Justice of the Delaware Supreme Court, upon written request by the Chancellor or by the President Judge of the Superior Court, to cross-designate a Judge of the Superior Court to sit in the Court of Chancery, or vice versa, for a specified case and period of time. *Wal-Mart Stores, Inc. v. AIG Ins., Co.*, 2006 WL 3742596, at *4 n.27 (Del. Ch. Dec. 12, 2006).

[11] Del. Ch. D.I. 20. Humanigen, Madison, and Nomis in their joint brief assert four additional arguments, but these last four are all arguments against forms of relief Savant seeks for breach of contract, and so are duplicative of the parties' argument that Savant fails to state a claim for breach.

for lack of standing,[12] while its second motion seeks summary judgment against both Humanigen and Madison on grounds of common law champerty.[13]

## II. STANDARD OF REVIEW

Humanigen, Madison, and Nomis's attack on Savant's capacity to sue falls under Court of Chancery Rule 9(a)[14] for which the Court must weigh the evidence presented.[15]

Nomis's challenge to personal jurisdiction falls under Court of Chancery Rule 12(b)(2). Jurisdictional challenges place the burden on the party seeking judicial intervention to show that jurisdiction exists,[16] keeping in mind that Delaware's long-arm statute[17] is "broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause."[18]

---

[12] D.I. 155.

[13] D.I. 75.

[14] "When a party desires to raise an issue as to the legal existence of any party or the capacity of any party to sue or be sued or the authority of a party to sue or be sued in a representative capacity, the party shall do so by specific negative averment, which negative averment shall include such supporting particulars as are peculiarly within the pleader's knowledge." Del. Ch. Ct. R. 9(a).

[15] *See In re Jenzabar, Inc. Derivative Litig.*, 2014 WL 3827501, at *5 (Del. Ch. Jul. 30, 2014) ("[O]n a motion to dismiss pursuant to Rule 9(a), this Court may consider supporting evidence of such capacity, or lack thereof.").

[16] *Maloney-Refaie v. Bridge at School, Inc.*, 958 A.2d 871, 882 (Del. Ch. 2008).

[17] DEL. CODE. ANN. tit. 10, § 3104(c) (2018).

[18] *Hercules Inc. v. Leu Tr. & Banking (Bahamas) Ltd.*, 611 A.2d 476, 480–81 (Del. 1992).

By contrast, Humanigen, Madison, and Nomis's allegation that Savant fails to state a claim is analyzed under Rule 12(b)(6),[19] as is Savant's attack on Madison's standing.[20] By that standard, the Court accepts all of the non-movant's well-pleaded allegations as true, draws all reasonable inferences in its favor, and grants dismissal only if recovery is not possible under any reasonably conceivable set of circumstances susceptible of proof.[21]

Likewise, in Savant's summary judgment motion under Superior Court Rule 56, the Court examines the record in the light most favorable to the non-movant, and grants judgment only if there are no material issues of fact in dispute and the moving party is entitled to judgment as a matter of law.[22] Rule 56 and Rule 12(b)(6) standards are closely related such that a motion to dismiss accompanied by

---

[19] Court of Chancery Rule 12(b)(6) and Superior Court Rule 12(b)(6) are verbatim identical.

[20] *See Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1285–86 (Del. 2007) ("[W]here, as here, the issue of standing is so closely related to the merits, a motion to dismiss based on lack of standing is properly considered under Rule 12(b)(6) rather than Rule 12(b)(1).").

[21] All Delaware courts treat precedents from the Court of Chancery and Superior Court's respective Rules 12(b)(6) interchangeably. *See In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (a Court of Chancery appeal quoting the Rule 12(b)(6) standard articulated in *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002), a Superior Court appeal); *see also CLP Toxicology, Inc. v. Casla Bio Holdings LLC*, 2020 WL 3564622, at *9 n.65 (Del. Ch. Jun. 29, 2020) (explaining that the there is no substantive difference between the two Courts' rules nor any operative difference in the analyses thereunder that must be engaged to decide a Rule 12(b)(6) motion to dismiss).

[22] *Cole v. Delaware League for Planned Parenthood, Inc.*, 530 A.2d 1119, 1124 (Del. 1987).

documents outside the adverse pleading may be treated by the Court as a motion for summary judgment.[23]

Both of Savant's Motions attack only Humanigen's putative assignment of the MDC to Madison. Savant's challenge is, in effect, who of Humanigen and Madison is permitted to champion the Superior Court Complaint's MDC-related claims rather than an attack on the substance of those claims *per se*.

By contrast, Humanigen, Madison, and Nomis's Rule 12(b)(6) attacks assert that Savant's complaint fails to state a claim. As such, the Court summarizes the facts of this case in the light most favorable to Savant as non-movant, except as to the assignment, which is characterized in the light most favorable to Humanigen, Madison, and Nomis as non-movants on that issue. Savant's capacity, for which the Court is fact finder, is addressed separately thereafter.

## III. FACTUAL BACKGROUND

The parties all agree that a nonparty competitor, Chemo Research, misappropriated Savant's data and used it to obtain FDA approval and market exclusivity for the Drug ahead of Savant and Humanigen.[24] Humanigen sued Savant

---

[23] *Furman v. Delaware Dept. of Transp.*, 30 A.3d 771, 774-75 (Del. 2011) (explaining the conversion process under Superior Court Rules 12(b)(6) and 56); *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 68-69 (Del. 1995) (same for Court of Chancery Rules 12(b)(6) and 56).

[24] Second Amended Complaint ¶¶ 5, 14 (D.I. 138).

in Delaware Superior Court, and Madison sued Chemo Research in federal court in New Jersey ("New Jersey Suit").[25]

Savant alleges, and at this procedural stage the Court accepts as true, that Humanigen had advance warning of the imminence of Chemo Research's FDA approval, and of its wrongful misappropriation of the proprietary Savant data.[26] Savant alleges that Humanigen withheld this information and abandoned its work on the Drug, instead deciding to pursue a business strategy of litigation, both against Chemo Research in the New Jersey Suit, and against Savant.[27]

Nomis and Humanigen created and organized Madison on February 27, 2018.[28] Nomis and Humanigen are the sole members of Madison, with respectively 70 percent and 30 percent ownership stakes.[29] That creation and organization included Humanigen assigning Madison its MDC rights, including the license to the Drug and its litigation rights against both Savant and Chemo Research.[30]

---

[25] *See generally* Complaint, *Madison Joint Venture LLC v. Chemo Research S.L.*, 2:19-cv-08012 (D. N.J. Mar. 7, 2019).

[26] First Amended Complaint ¶¶ 59–62 (Del. Ch. D.I. 11).

[27] *Id.*

[28] *See* Aff. of Travis S. Hunter Ex. 15 ["Madison Operating Agreement"] at 4 (D.I. 107) ("'Effective Date' means February 27, 2018.") (bold and italics omitted).

[29] Madison Operating Agreement Ex. A.

[30] Madison Operating Agreement Ex. B at 1–2.

This assignment of litigation rights provided that in the event of a favorable judgment for certain of Humanigen's claims against Savant combined with another for Savant against Humanigen, Humanigen would be permitted to retain and offset its own favorable judgment up to the value of Savant's ("Offset Clause").[31] The transfer also purports to exclude from assignment the *liabilities* arising from the MDC ("Liabilities Clause").[32]

Nomis and Humanigen specifically acknowledged in the documents organizing Madison that the assets transferred to Madison were transferred to Madison the entity, separate and distinct from themselves as its members.[33] The agreement disavows any connection between membership and control,[34] but provides that Madison compensate Humanigen for its employees' work furthering the ongoing lawsuits.[35]

---

[31] *Id.*

[32] Madison Operating Agreement Ex. C at 1.

[33] Madison Operating Agreement at 11.

[34] *Id.* at 25–27.

[35] *Id.* at 26.

## IV.  SAVANT'S CAPACITY

A business entity cannot maintain an action in Delaware if it is not in good standing in this State.[36] Defective status by a plaintiff entity is grounds to halt a suit, but the entity does not suffer dismissal without an opportunity to cure.[37] Savant has cured any defect in its status.[38]

Humanigen, Nomis, and Madison rely on *HWI Partners, LLC v. Choate, Hall & Stewart LLP* for the alternative theory that defective status is incurable and requires dismissal of a suit.[39] *HWI Partners* was a federal case that acknowledged that entity status defects are curable in Delaware state courts, but held that the more limited subject matter jurisdiction of federal district courts denies those tribunals the power to permit cure.[40] Savant's suit is and has always been in the Court of Chancery, never entering the federal court system. The limitation in federal district court jurisdiction articulated in *HWI Partners* has no effect on Savant's suit.

---

[36] *B&B Financial Servs., LLC v. RFGV Festivals, LLC*, 2019 WL 2006487, at *3 (Del. Super. Ct. May 2, 2019).

[37] *Hudson Farms, Inc. v. McGrellis*, 620 A.2d 215, 221 (Del. 1993).

[38] *See* Wood Aff. ex. 1 (Del. Ch. D.I. 25) (certification from the Delaware Secretary of State that Savant is in good standing and has legal existence as of October 17, 2019).

[39] 2013 WL 6493118, at *3 (D. Del. Dec. 11, 2013).

[40] *Id.*

## V. PERSONAL JURISDICTION OVER NOMIS

Forming a Delaware entity for the purpose of engaging in a transaction constitutes the "transaction of business" within the State of Delaware sufficient to confer specific personal jurisdiction over the party forming the entity.[41] And a single transaction is sufficient to confer personal jurisdiction for claims based on that transaction.[42] By Nomis's own description, Nomis formed Madison for the purposes of undertaking business ventures related to the Drug, including pursuit of this litigation.[43]

Having come to Delaware to form Madison specifically to seek redress against Savant under the MDC in a Delaware courtroom, Nomis cannot escape that same courtroom when Savant asserts its own rights under the precise same instrument and transaction.

## VI. FAILURE TO STATE A CLAIM

Breach of contract is a claim with three elements: "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."[44] A declaratory judgment is better understood as a remedy than a sort of

---

[41] *Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1196 (Del. Ch. 2010) (citing *Papendick v. Robert Bosch GmbH*, 410 A.2d 148, 152 (Del. 1979)).

[42] *Reid v. Siniscalchi*, 2018 WL 620475, at *14 (Del. Ch. Jan. 30, 2018).

[43] Mot. to Dismiss at 16 (Del. Ch. D.I. 20).

[44] *Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1279 n.28 (Del. 2016) (quoting *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003)).

substantive claim or action.[45] Recognition of a fraudulent transfer is likewise a species of remedy, permitting a creditor or plaintiff to recover assets putatively transferred by the debtor/defendant as though the debtor/defendant still possessed them.[46] A constructive trust is yet another type of remedy.[47] While Savant's Chancery complaint and the corresponding Motion to Dismiss assert those remedies as separate counts, they are each merely different remedial prayers relating to a single cause of action, breach of the MDC.

Savant alleges that Humanigen concealed its knowledge that Chemo Research had misappropriated Savant's proprietary data, and abandoned development of the Drug well ahead of Chemo Research's FDA approval. If proven at trial, these acts breach a variety of obligations the MDC creates[48] leading directly to Savant's injury.

---

[45] *See Rollins Int'l., Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662 (Del. 1973) ("[T]he basic purpose of the Declaratory Judgment Act is to enable the courts to adjudicate a controversy prior to the time when a remedy is traditionally available and, thus, to advance the stage at which a matter is traditionally justiciable.").

[46] *See Ki–Poong Lee v. So*, 2016 WL 6806247, at *3 (Del. Super. Ct. Nov. 17, 2016) ("[Delaware's Uniform Fraudulent Transfers Act] provides remedies to creditors who are defrauded by debtors who transfer assets or incur obligations" in violation of its terms.) (citing *In re Mobilactive Media, LLC*, 2013 WL 297950, at *30 (Del. Ch. Jan. 25, 2013)).

[47] *See Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993) ("The doctrine of constructive trust effectuates the principle of equity that one who would be unjustly enriched, if permitted to retain property, is under an equitable duty to convey it to the rightful owner. It is an equitable remedy of great flexibility and generality, and is viewed as a remedial and not a substantive institution.") (citing *McMahon v. New Castle Assocs.*, 532 A.2d 601, 608 (Del. Ch. 1987)).

[48] *E.g.* MDC § 4.4 ("each party shall use Diligent Efforts to, either by itself or in collaboration with its Affiliates and Third Parties, conduct the activities assigned to it under the Joint Development Plan"); MDC § 5.4 (requiring Humanigen to complete and convey a feasibility

Because Savant properly pleads facts that would satisfy the three elements of breach, it states a prima facie claim adequate to survive Rule 12(b)(6).

Humanigen and Madison additionally argue that the claim of breach fails due to the requirements contained in the termination provisions of the MDC. Under the provision for "Termination for Material Breach," the party seeking termination must first issue a notice of default and wait for the end of the contractual cure period.[49] Humanigen and Madison argue that a temporary restraining order issued in the federal bankruptcy court, extended by agreement until this Court issued the preliminary injunction,[50] enjoined issuance of a default notice and tolled the cure period, vitiating any action for breach. But that termination provision is expressly "without prejudice to any other remedies available to [the terminating party] at law or in equity."[51] A default notice under the MDC necessarily asserts an existing breach, and so is not a prerequisite necessary to state a claim for breach. Rather, the clause merely provides a potential contractual remedy for breach not requiring judicial action.

---

analysis for development and commercialization of the Drug in the European Union and Japan); MDC § 7.5(a) (requiring Humanigen and Savant to each report to the other if they become aware of any unlawful activity in relation to the Drug, and take other remedial actions).

[49] MDC § 13.3(a).

[50] D.I. 248.

[51] MDC § 13.3(a).

## VII. SAVANT'S MOTIONS

### A. MODERN CHAMPERTY

Champerty and maintenance are common law offenses of officiously intermeddling in a stranger's suit.[52] *Maintenance* was assistance offered without expectation of personal gain, which when aggravated by exchange for a share of the suit became *champerty*.[53] Such a sale of a lawsuit was severely punished under the common law and its Roman antecedents.[54] Champerty is an ancient feature of Delaware law, adopted from the common law by the colonial legislature in 1742.[55]

Delaware continues to recognize a policy against sale of a lawsuit.[56] At the same time, Delaware generally favors the free exchange of property.[57] These two

---

[52]   4 William Blackstone, Commentaries *134–35.

[53]   *Id.*

[54]   *Id.* Some sources date the origins of the prohibition on sale of an interest in lawsuits further still to Greek antiquity. Max Radin, *Maintenance by Champerty*, 24 Cal. L. Rev. 48, 51 (1935) (citing Isaeus, *In the Suit Against Dicaeogenes and Leochares* (4th century B.C.E.), *trans. and printed in* 4 The Works of Sir William Jones 81 (1799)).

[55]   *See Bayard v. McLane*, 3 Harr. 139, 215 (Del. 1840) ("The earliest legislative act of this government on the subject of maintenance and champerty is the act of 15 Geo. 2, Anno. 1742, (1 Del. Laws 239). It does not define the offence; but refers, generally, to the common law, and the statute laws, of England."). The version of common law champerty adopted at that time was founded in legislation adopted by the English parliament during the reign of Edward I, as modified by other enactments of the Delaware colonial legislature in the 1720s and 30s. *Id.* at 216.

[56]   *Schultz v. Ginsburg*, 965 A.2d 661, 668 (Del. 2009) (citing *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1169 (Del. Ch. 2002)).

[57]   *See Tracey v. Franklin*, 67 A.2d 56, 58 (Del. 1949) ("An important incident of the ownership of property is its transferability and the proposition is frequently stated in the texts that a general restraint upon alienation is invalid because contrary to public policy. . . [a]n examination of the

policies stand in tension, because superficially they appear to call into question whether a property buyer obtains the right to prosecute property torts preceding the purchase.[58]

The resolution of this apparent tension is that Delaware permits conveyance of a lawsuit so long as the transferor possesses and conveys a complete interest in the underlying right and makes the litigant the "bona fide owner of the claim in litigation"[59] and not just the litigation itself. By way of example, sale of property adversely possessed by a third party is champertous.[60] In such a transaction, the transferor is conveying not the right, but just an opportunity to seek a judicial order conveying the right.

Champerty is inapplicable—and transfer of litigation rights permitted without regard to the transferror's complete possession of the underlying rights—when the transferee already has a legal or equitable claim on the rights that predates and is

---

decisions, however, discloses that, as to personal property, and particularly corporate stock, the rule is subject to frequent exceptions.").

[58] *See In re Activision Blizzard, Inc. Stockholder Litig.*, 124 A.3d 1025, 1050 n.14 (Del. Ch. 2015) (noting that *Schultz* would have potentially destabilizing consequences if it were construed to embody a public policy prohibiting "buying property rights that include choses in action.").

[59] *Drake v. Northwest Natural Gas Co.*, 165 A.2d 452, 454 (Del. Ch. 1960).

[60] *See Hall v. Delaware*, 655 A.2d 827, 830 (Del. Super. Ct. 1994) (sale of an impounded car champertous because seller lacked possession).

outside of the transfer.[61] Blood relationships provide such an interest,[62] and so champerty is not implicated when an heir sues to recover property stolen from an ancestor.[63] Similarly, a creditor can accept assignment of a debtor's suit since the debt itself creates in the creditor an interest in the debtor's assets.[64] This last example appears to be the most attenuated permitted relationship in Delaware, since transfer of litigation rights to a *creditor's creditor* is void for champerty.[65]

Critically, these exceptions are only necessary for an assignee seeking to sue in its own name. But a party is generally free to privately contract or assign *the proceeds of a judgment* or a portion thereof, as distinct from the suit itself.[66] In such

---

[61] *Drake*, 165 A.2d at 454.

[62] *Hall*, 655 A.2d at 830 (Del. Super. Ct. 1994) (finding of champertous assignment, in part, because "absent from the record is any evidence suggesting that Petitioner stands in a close relationship with [assignor] by consanguinity or affinity") (citing *Bayard*, 3 Harr. at 208 (noting that claims of champerty do not extend to persons "being *in any way of kin or affinity* to either of the parties") (emphasis in original)).

[63] *E.g. Altmann v. Republic of Austria*, 335 F.Supp.2d 1066, 1067–68 (C.D. Cal. 2004) (the "Woman in Gold" case, where an heir sought recovery of artwork stolen from her family during Nazi rule in Austria).

[64] *In re Pursuit Capital Mgmt., LLC*, 595 B.R. 631, 667 (Bankr. D. Del. 2018) (citing *Southeastern Chester Cty. Refuse Auth. v. BFI Waste Servs. of Pennsylvania, LLC*, 2017 WL 2799160, at *8 (Del. Super. Ct. Jun. 27, 2017)).

[65] *Street Search Partners, L.P. v. Ricon Int'l., L.L.C.*, 2006 WL 1313859, at *4 (Del. Super. Ct. May 12, 2006).

[66] *See Indus. Tr. Co. v. Stidham*, 33 A.2d 159, 160–61 (Del. 1942) (where a plaintiff in an action for breach of contract "does not purport to assign the chose in action but merely the amount of the judgment subsequently to be recovered. . . the present assignment would have been valid and enforceable if made at the time and under the circumstances contended.").

a case the assignor remains the named party and retains control of the litigation, as occurs in contingent-fee representation.[67]

## B. THE ASSIGNMENT

Madison sues based on the assignment in the Loan Satisfaction Agreement and Madison Operating Agreement. In those documents, Humanigen conveyed "all assignable rights under or in connection with the Assigned Contracts."[68] The list of Assigned Contracts includes the MDC.[69]

After that broad and inclusive language, the Madison Operating Agreement includes the Offset Clause and thereafter the Liabilities Clause, purporting to restrict the assignment by retaining offsets to a final judgment and all liabilities under the MDC with Humanigen rather than Madison.[70]

---

[67] *See Smyth v. Klauder*, 52 F.2d 109, 110 (3d Cir. 1931) ("[I]n those states [of the Third Circuit] it is not champertous for an attorney to agree with his client to render services for a contingent fee."); *Corcoran v. George Kellogg Structural Co.*, 166 N.Y.S. 269, 271 (N.Y. App. Div. 1917) (A contingent-fee client retains "complete control of the litigation" and may fire the attorney and then make a settlement "however arbitrary" with the adverse party, at which point the attorney would be entitled to "only the reasonable value of the services which he has rendered.").

[68] Madison Operating Agreement, ex. B. at 1.

[69] *Id.* at 2.

[70] Madison Operating Agreement ex. C at 1.

### i. *Humanigen's Capacity to Assign Unilaterally*

Personal service contracts generally cannot be assigned without the consent of the other party.[71] The MDC expressly included a term providing consent in Section 15.2, stating:

> This Agreement (i) may be assigned by [Humanigen] in whole or in part to any Third Party without the consent of [Savant], and (ii) may not be assigned by [Savant] in whole or in part without the consent of [Humanigen]; provided, that [Savant] may assign this Agreement in whole without the consent of [Humanigen] to an Affiliate or in the event of a Change of Control of the Company. Any permitted assignee will expressly assume all obligations imposed on the assigning Party by this Agreement in writing. [72]

Section 15.2 further characterizes any nonconforming assignment as "null and void."[73] Savant argues that the "Any permitted assignee" sentence modifies both 15.2(i) and 15.2(ii), and hence that the assignment was nonconforming and void since Madison created no such writing.

The Court is compelled to interpret clear and unambiguous terms according to their ordinary meaning in a manner that gives effect to all provisions therein.[74]

---

[71] *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *11 (Del. Ch. Jan. 29, 2010) (citing *Grynberg v. Burke*, 1981 WL 15118, at *1 (Del. Ch. May 20, 1981)).

[72] MDC § 15.2.

[73] *Id.*

[74] *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012).

Section 15.2(i) includes a unilateral right for Humanigen to assign the contract *in part*, which would be nonsensical if an assignee had to accept *all* obligations of the contract in a case of a *partial* assignment. The "Any permitted assignee" sentence therefore must modify only Section 15.2(ii) and so only limits Savant's ability to engage in a unilateral assignment in whole, and not Humanigen's unrestricted right to unilaterally assign the MDC in whole or in part.

Humanigen was therefore within its rights under the MDC to assign the contract to Madison.

### ii. The Effect of Assignment

Absent an agreement otherwise, the assignor of a contract remains liable as a surety for the assignee's performance.[75] The MDC contains language identifying what circumstances would relieve Humanigen of duties as a surety to its chosen assignee(s):

> Further (a) if the assignee of [Humanigen] is of equal or superior (i) creditworthiness and (ii) ability to perform obligations under this Agreement to [Humanigen] as of the date of assignment, as demonstrated by the assignee's (x) ability to fund the Joint Development Program for the first six (6) months after assignment and (y) track record of research and development and product commercialization in the biopharmaceutical industry, then [Humanigen] shall not remain liable for the assignee's performance of its obligations under this Agreement, and (b) if the assignee of [Humanigen] is not of equal or superior

---

[75] *Reserves Dev. LLC v. Crystal Props., LLC*, 986 A.2d 362, 370 (Del. 2009).

creditworthiness and ability to [Humanigen] as of the date of assignment, then [Humanigen] shall remain directly liable to the Company for all performance obligations (including payment obligations) of the assignee under this Agreement.

Madison describes itself as being a new joint venture between Humanigen and Nomis for developing the Drug.[76] The document assigning the MDC is itself one of Madison's organizing documents. Madison as a newly formed entity plainly could not have a "track record of research and development and product commercialization in the biopharmaceutical industry" on par with Humanigen and therefore cannot satisfy the conditions necessary to relieve Humanigen of responsibility to act as surety.

Notwithstanding any assignment, Humanigen remains a surety of Madison to Savant for performance under the MDC.

### iii. The Effect of the Offset and Liabilities Clauses

As noted above, the plain language of the Madison Operating Agreement assigns the MDC *in toto* to Madison. The Madison Operating Agreement expressly conveys to Madison both control of and the duty to fund this litigation.[77] Humanigen cannot then sue Savant under rights it conveyed to another.

---

[76] Second Amended Compl. ¶ 138 (D.I. 138).

[77] Madison Operating Agreement at 14.

Despite the assignment, the exhibits attached to the Madison Operating Agreement purport to introduce limitations through the Offset Clause and Liability Clause.

The Offset Clause excludes from the assignment "The amount of the Savant Cost Overrun Claims that the Humanigen Member may utilize to offset claims brought by Savant that the Humanigen Member owes Savant $2 million in milestone payments under the MDC."[78] The Liabilities Clause "disclaims" and denies the assumption of "all Liabilities under the Assigned Contracts." [79]

The Liabilities Clause's meaning is difficult to divine. The MDC is a complicated document laying out two pharmaceutical companies' mutual obligations for the development and commercialization of the Drug. Many of these complex personal services intrinsically involve cooperation and are nonamenable to separation into distinct "assets" and "liabilities."[80] Moreover, the Offset Clause addresses the MDC solely as a financial asset, describing assignment and retention in purely fungible monetary terms.

---

[78] Madison Operating Agreement Ex. B at 2.

[79] Madison Operating Agreement Ex. C at 1.

[80] For example, the MDC § 6.1 establishes the Joint Steering Committee, which is staffed equally by the contracting parties [under §6.1(b)] who have the alternating responsibility to produce meeting minutes [under §6.1(d)].

Between these two clauses, the Madison Operating Agreement appears to contemplate the MDC not as a contract for a mutual exchange of promises, but as a bundle of litigation actions for money damages eventually to become a simple net judgment. Under such a reading, the Offset Clause and Liability Clause are not about parsing the MDC to reduce the scope of the original assignment. Instead, those clauses are a separate agreement between Humanigen and Madison contingently allocating a favorable judgment should Madison prevail in the litigation—litigation which Humanigen assigned to Madison *in toto*.

Under this reading, the assignment avoids champerty. Humanigen assigned the contract and litigation to Madison, and Madison sues in its own name. Madison is in sole control of the Superior Court suit. The Offset Clause and Liabilities Clause govern Humanigen and Madison's respective rights against one another to the proceeds of the final judgments in the two consolidated Delaware suits. Contractual interest in a judgment does not implicate the prohibitions of champerty.

The only alternative reading bearing any semantic relationship to the documents would be if Nomis, Humanigen, and Madison had sought to assign Madison the right to sue Savant for money damages for breach under the MDC, while leaving responsibility to perform with the financially-troubled Humanigen. Separation of a lawsuit enforcing a contract from the underlying contract is

champerty, and such a contract would be void.[81] Delaware courts avoid unreasonable contract interpretations,[82] and so the Court declines this champertous reading of the Madison Operating Agreement.

## VIII. CONCLUSION

Humanigen and Savant created the MDC to govern a mutual collaborative relationship to develop and commercialize the Drug. Following the breakdown in that relationship, both entities became financially insolvent. As part of a restructuring agreement with its creditors, Humanigen spun off its business to develop the Drug on to a new entity—Madison—which it jointly created with its creditor, Nomis. In furtherance of this, and in exchange for extensive loan forgiveness from Nomis, Humanigen assigned its interest in the MDC and in any MDC-related litigation to Madison. In undertaking this transaction, Nomis submitted itself to the jurisdiction of Delaware courts for MDC-related suits.

Savant, having cured any defect in its corporate status, has the capacity to now seek redress via its initiated action.

---

[81] *See Gibson v. Gillespie*, 152 A. 589, 593 (Del. Super. Ct. 1928) ("It would be the duty of the court to dismiss a case in which the evidence disclosed that the assignment of the cause of action sued upon was tainted with champerty.").

[82] *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 n.21 (Del. 2010) ("In placing a construction on a written instrument, reasonable rather than unreasonable interpretations are favored by law. Results which vitiate the purpose or reduce terms of the contract to an absurdity should be avoided.") (quoting *Gore v. Beren*, 867 P.2d 330, 337 (Kan. 1994)).

The provisions of the MDC permitted the assignment Savant challenges. To be true to its finding of the nonchampertous nature of that assignment, however, the Court must find that having assigned away its interest in the MDC, Humanigen now lacks standing in the Superior Court suit. Those claims belong to Madison alone.

Neither of Savant's Motions asks precisely for Humanigen's dismissal as a party on standing grounds. But all issues surrounding the assignment, champerty, and standing were fully litigated by Humanigen, Madison, and Nomis, and they share greatly overlapping interests.[83] Likewise, the Court may consider standing *sua sponte*,[84] and Humanigen was on notice that Savant sought to dispose of its claims through these motions.

All that said, Humanigen retains its interest in the Superior Court suit through its minority ownership stake in Madison. So Humanigen is **DISMISSED** from all counts of its joint Superior Court complaint with Madison, but remains a litigant in

---

[83] Just so, they share the same counsel.

[84] *See Mills v. Trans Caribbean Airways, Inc.*, 272 A.2d 702, 704 (Del. 1970) ("[S]tanding to present a constitutional question is so fundamental as to permit examination thereof at any time, including inquiry by the Court Sua sponte."); *see also In re Pantalone*, 2011 WL 6357794, at *2 (Del. Ch. Dec. 9, 2011) ("Standing is a threshold question, and, because standing is jurisdictional in nature, the Court may raise it *sua sponte*. . . . Standing is the requisite interest that must exist in the outcome of the litigation at the time the action is commenced.") (internal citations and quotes omitted); *Kent Cty. Equip., Inc. v. Jones Motor Grp., Inc.*, 2009 WL 737782, at *1 (Del. Super. Ct. Mar. 20, 2009) (Court raised the issue of standing *sua sponte* at argument on a separate dispositive motion, and then imposed dismissal once party had notice and opportunity to respond to the legal arguments which gave rise to the dismissal).

Savant's Chancery Court complaint where it is surety for Madison's performance.

The parties' motions are all otherwise **DENIED**.

   **IT IS SO ORDERED.**

_____
**Paul R. Wallace, Judge**